2021 IL App (1st) 171483-U

No. 1-17-1483

Second Division
March 30, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 8037 |
| EDDIE FENTON, | ) ) | Honorable Kenneth J. Wadas |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justice Lavin concurred in the judgment. Presiding Justice Fitzgerald Smith dissented.

**ORDER**

¶ 1    *Held*: The trial court's summary dismissal of defendant's postconviction petition is affirmed where defendant's claims of actual innocence, ineffective assistance of trial counsel, and unconstitutional sentence under the eighth amendment and the proportionate penalties clause are meritless.

¶ 2 Following a 2010 jury trial, defendant Eddie Fenton was convicted of first-degree murder (720 ILCS 5/9–1(a)(1), 9–1(a)(2) (West 2006)) in connection with a fatal shooting that occurred on April 1, 2006, when defendant was 20 years old. He was sentenced to a total of 110 years' imprisonment. In 2017, defendant filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), which is the subject of this appeal. Therein, defendant raised several claims of error. The trial court summarily dismissed his petition. On appeal, defendant solely argues the following: (1) he presented the gist of a claim of actual innocence based on Donnie Moore's recantation affidavit; (2) he received ineffective assistance of counsel based on his trial counsel's failure to interview alibi witnesses; and (3) his 110-year sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4 The charges against defendant arose from the fatal shooting of Willie Williams during a large brawl in front of the Ford City Mall movie theater in the early hours of April 1, 2006. At the time of the offense, defendant was 20 years old. The following evidence was presented at his trial.

¶ 5                                    A. Jury Trial

¶ 6 Chicago police detective Patrick Thelen testified that around 2 a.m. on April 1, 2006, he went to the Ford City Mall parking lot after receiving a dispatch regarding a shooting near the movie theater. At the scene, he learned that Williams had been taken to the hospital. No shell casings were found at the scene, which Detective Thelen testified was indicative of a revolver.

¶ 7 Yolanda Metayer testified that she was close friends with Williams. On the night of March 31, 2006, they and several other friends went to the Ford City Mall to see the movie *ATL*. As she and Williams were walking in the parking lot after the movie, they observed a group of people

fighting. She and Williams ran towards the fight. Metayer testified that neither she nor Williams was armed, but that another man involved in the fight had a gun in his hand. As Metayer turned around to run away, she heard a gunshot and saw Williams fall to the ground. She discovered that Williams had been shot in the head. Eventually, an ambulance took Williams to the hospital.

¶ 8 Metayer identified defendant in court as the man who shot Williams, though she did not know defendant by name and had never seen him before the shooting. She also picked defendant out of a photographic line-up on April 2, 2009 as the individual who shot Williams.

¶ 9 Donta Mitchell testified that he also attended the showing of *ATL* with Williams and other friends. After the movie, a group of men walked up to Mitchell in the parking lot and he punched one of them, later identified as Donnie Moore, in the face. A large fight then broke out among several people. He saw Williams and Metayer running towards the fight and a few seconds later he heard a gunshot and ran away. He testified that Williams did not have a gun and was not part of the fight. On cross-examination, Mitchell was presented with a written statement he gave to police and the State's Attorney on November 19, 2009. He testified that the statement was incorrect where it stated that Williams was involved in the fight and that he did not tell them that he saw the shooter or provide them with a description. Also, on that date, he identified a photograph of Moore as the individual he punched.

¶ 10 Devon Pearson testified that on March 31, 2006, he, his brother, defendant, Moore, and Jerry Williams (Jerry) went to the Ford City Mall movie theater to see the movie *ATL*. As they left the theater, Moore became involved in a fistfight in the parking lot. At that point, Pearson did not see any weapons. During the fight, Pearson heard a gunshot and saw defendant running away with a silver gun in his hand. He testified that defendant was only a few steps away from Williams, who was lying on the ground. Pearson ran to the car, and he and his brother left the area. He testified

that he initially told police that he did not know anything about the shooting because he was "scared" and "didn't want to get involved with it." He later told the detectives that defendant shot Williams. On cross-examination, Pearson confirmed that he did not see defendant shoot Williams but saw him running away with a gun.

¶ 11 Moore testified that he went to the movies with defendant and some other friends on March 31, 2006. He stated that after they left the movie theater, there was an altercation in the parking lot. He was involved in a fistfight with another man, and other people also began fighting. He then heard a gunshot and saw defendant put a gun in his waistband. Everyone ran away, and he saw a man fall to the ground. On December 18, 2009, Moore spoke with the police regarding the shooting. Initially, he did not tell the police that defendant shot Williams because he "was scared" and believed that he was going to be charged with murder. He eventually told the police what occurred, which was memorialized in a written statement. He also testified before a grand jury that defendant shot Williams.

¶ 12 On cross-examination, Moore acknowledged that around the time he spoke with the police he had some suspicions that defendant was dating the mother of Moore's child. He also identified a photograph of Mitchell as the person he was fighting. Finally, he testified on redirect that he was not aware of anyone else having a gun that evening other than defendant.

¶ 13 Levi Ford testified that he previously did not show up to court when he was subpoenaed because he and his brother were threatened. He confirmed that he went to see *ATL* with defendant, Moore, and Jerry on March 31, 2006. After the movie, he saw Moore fighting with another man in the parking lot and he saw defendant pull a black revolver out of his waistband and shoot at someone. They ran to the car and left the area. On October 11, 2008, he gave a statement to the

police identifying defendant as the individual who shot Williams and he testified to the same before a grand jury.

¶ 14    Robert Rodwell testified that he did not know or remember what occurred on the night of March 31, 2006. Although he acknowledged meeting with the police and the State's Attorney on April 5, 2010, he testified that he was not taking his medications for his bipolar disorder at the time. Rodwell was confronted with his written statement, wherein he claimed that he was at the movie theater that evening; he saw a man punch Moore; a large brawl broke out; he saw a gun in defendant's hand; and he heard a gunshot and saw a man fall to the ground. However, in court, Rodwell testified that he did not remember giving the statement and he did not recognize his signature. He further stated that he did not recall any of his grand jury testimony, which was in accordance with his written statement, a transcript of which was admitted into the record. On cross-examination, Rodwell testified that he was at home on the night of March 31, 2006.

¶ 15    Jerry testified that on March 31, 2006, he went to see *ATL* with defendant, Moore, and other friends. When he left the movie theater, he saw a large group of men, including Moore, in a fistfight. He then heard a gunshot but did not see who fired the shot and did not see defendant with a gun.

¶ 16    According to the transcript of Jerry's grand jury testimony, which was admitted into evidence, he identified defendant as the individual with a revolver who shot Williams that evening at the movie theater. In the transcript, Jerry testified that he was not bribed or forced to testify and that the police had treated him fairly. However, Jerry testified at trial that his grand jury testimony was coerced by Assistant State's Attorney Pat Morley.

¶ 17    Chicago police detective Oscar Arteaga testified that he and his partner, Detective Saul Del Rivero, were assigned to investigate Williams' murder. He testified that no one coached Jerry on

what to say to the grand jury. He testified that Rodwell did not appear under the influence of any medication and there were no issues with his demeanor when he was interviewed. On cross-examination, he stated that he did not threaten Jerry.

¶ 18     Detective Del Rivero, who at the time of trial was a field representative for the Fraternal Order of Police, testified that on May 12, 2009, he spoke with Jerry at the Cook County Department of Corrections. He stated that Jerry initially denied having any knowledge of the shooting but later admitted to being present and seeing defendant shoot the victim. Detective Del Rivero stated that Jerry made the same statements during another conversation in September 2009 and also during his grand jury testimony. Detective Del Rivero testified that Jerry was not threatened into giving false testimony and was not bribed to testify against defendant. On cross-examination, he acknowledged that no weapon, fingerprints, or other ballistics evidence was recovered from the scene of the shooting.

¶ 19     The State rested its case-in-chief, and defendant moved for a directed verdict, which the court denied.

¶ 20     The defense called Kimyona Taylor, an investigator with the Cook County Public Defender's Office, to testify. She stated that she contacted Metayer, who refused to speak with her. The defense then rested.

¶ 21     The jury found defendant guilty of first-degree murder and that he personally discharged a firearm in the commission of the murder.

¶ 22                              B. Sentencing Hearing

¶ 23     The court reviewed defendant's presentence investigation report (PSI), which indicated that he had been diagnosed with bipolar disorder and was prescribed Wellbutrin. The PSI further stated that defendant had a good relationship with his family and two children. It outlined his

extensive criminal history, which included convictions for cruelty to animals, manufacture/delivery of cannabis, possession of cocaine, and unlawful use of a weapon.

¶ 24     At the sentencing hearing, the court heard from three witnesses. Investigator McGough[1] from the Cook County Sheriff's Office, an expert in gang identification, testified that defendant admitted that he was a member of the "Black P-Stone" gang. Williams' father, Willie Williams Jr., and mother, Indira Rutes, gave victim impact statements. Both described their son as a caring individual with a lot of potential. His father started a foundation in his son's honor that mentors inner city youth.

¶ 25     The State argued that the court should give defendant a significant sentence because he killed an innocent person with no involvement in gangs or violence. The State further highlighted defendant's extensive criminal history; his gang membership; and his use of drugs. The defense, in mitigation, asserted that the court should give defendant a lower sentence because of his bipolar disorder and that, even with a minimum sentence of 45 years, defendant would still be in prison until he was 70 years of age.

¶ 26     The court addressed each statutory mitigating factor and found that none applied. The court considered defendant's extensive criminal history and opined that his rehabilitative potential was "extremely low" because he  has continued to be "armed and dangerous" even after several convictions. The court ultimately sentenced defendant to 50 years' imprisonment for first degree murder, plus a mandatory firearm enhancement of 60 years for personally discharging a firearm that caused death, for a total of 110 years. Defendant filed a motion to reconsider the sentence, which the court denied, stating:

---

[1]Investigator McGough's first name does not appear in the record.

"I think [defendant] belongs to a small group of individuals that represent extreme threats to society and pose a significant threat to society. That was one of the factors that I considered in the sentence I imposed. The sentence is within the statutory guidelines. It's not cruel and unusual, and I think it's totally appropriate considering all of the facts and circumstances of this case, the defendant's track record, and all of the other factors in aggravation and mitigation that I considered."

¶ 27                                    C. Direct Appeal

¶ 28    On direct appeal, defendant argued that: (1) the trial court erred in finding that he failed to establish a *prima facie* claim of racial discrimination during jury selection; (2) the trial court improperly weighed the mitigating and aggravating factors in fashioning his sentence; and (3) the firearm enhancement was unconstitutionally vague. This court affirmed defendant's conviction and sentence. *People v. Fenton*, 2015 IL App (1st) 130861-U. The supreme court denied his petition for leave to appeal *People v. Fenton*, No. 119486 (Sept. 30, 2015), and the United States Supreme Court denied his petition for writ of *certiorari*. *Fenton v. Illinois*, 136 S. Ct. 2514 (June 27, 2016).

¶ 29                               D. Postconviction Petition

¶ 30    On February 14, 2017, defendant filed the instant *pro se* postconviction petition containing the following claims. His sentence of 110 years' imprisonment is unconstitutionally excessive where the court failed to properly exercise its discretion and to consider his rehabilitative potential, mental illness, and youth. He also requests that he be given the opportunity to sufficiently develop the record with expert testimony relevant to his youth. Next, defendant claims ineffective assistance of trial counsel for failure to investigate several witnesses. As relevant here, defendant specifically argues that counsel should have investigated and interviewed Moore, which would

have revealed Moore's motivations for his testimony that he now recants and identifies Kenneth Bowen as the shooter. Defendant also asserts that counsel failed to investigate Charel Johnson as an alibi witness, who would have testified that on March 31, 2006, she was with defendant from 9 p.m. until the following day. Defendant claims that he attempted to provide the court with Johnson's affidavit, but the Department of Corrections would not accept her correspondence because she failed to include his inmate number. Finally, defendant claims ineffective assistance of appellate counsel and prosecutorial misconduct, which have not been asserted on appeal.

¶ 31    Attached to the petition is an affidavit from Moore, stating that he "testified falsely at [defendant's] trial" and the "truth is that [defendant] was never at the mall with us." He further avers that he testified falsely to avoid being charged himself and because "a few nights before 3-31-06" he discovered that defendant was having sexual intercourse with the mother of Moore's child. He continues that he told the police that defendant was the shooter even though he saw Kenneth Bowen, also known as "KB," shoot Williams in the back of the head. Finally, Moore states that he would testify to the information in the affidavit.

¶ 32    On May 5, 2017, the court summarily dismissed the petition. The court found that defendant's argument that his sentence violated the proportionate penalties clause was barred by *res judicata* as it was raised and determined on direct appeal. His sentencing argument based on *Miller v. Alabama* failed as defendant was not a juvenile, his sentence was not mandatory, and the trial court considered all the appropriate factors in mitigation and aggravation. As to defendant's claim of ineffective assistance of trial counsel, the court found that defendant failed to support his argument with affidavits from the potential alibi witnesses and, even taking defendant's allegations as true, their alleged testimony would not have changed the result at trial where several eyewitnesses identified defendant as the shooter. The court also found that trial counsel cross-

examined Moore at trial, thus directly contradicting defendant's assertion that counsel did not investigate or interview Moore. This appeal followed.

¶ 33                                II. ANALYSIS

¶ 34    Defendant limits his arguments on appeal to the following: (1) actual innocence based on the recantation affidavit of Moore; (2) ineffective assistance of trial counsel based on counsel's failure to investigate and interview Johnson as a potential alibi witness; and (3) constitutional violations based on his sentence of 110 years' imprisonment.

¶ 35    The Act provides a method for a defendant to collaterally attack a conviction by asserting it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/1221 (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding in a noncapital case has three stages. *Hodges*, 234 Ill. 2d at 10. At the first stage, a trial court may summarily dismiss a postconviction petition within 90 days if it "determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2016). At the second stage, counsel can be retained or appointed, and defendant must show that his petition makes a substantial showing of a constitutional violation. *People v. Morales*, 2019 IL App (1st) 160225, ¶ 17. During this stage, the State can participate and either answer the petition or move to dismiss. *Id.* At the third stage, the court holds an evidentiary hearing and determines whether the defendant is entitled to relief. *Id.*

¶ 36    In the first stage, as we have here, a petition is frivolous or patently without merit only when it "has no arguable basis in either fact or law." *Hodges*, 234 Ill. 2d at 11-12. A petition has no arguable basis in law or fact where it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. Additionally, a defendant's claim is considered frivolous or patently without merit if it is procedurally barred under either *res judicata* or forfeiture. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). The trial court may summarily dismiss a petition if the defendant

fails to "either attach the necessary 'affidavits, record or other evidence,' or explain their absence" (*People v. Collins*, 202 Ill. 2d 59, 66 (2002)), or if the petition simply alleges "nonfactual and nonspecific assertions that merely amount to conclusions (*People v. Morris*, 236 Ill. 2d 345, 354 (2010)). We review *de novo* the summary dismissal of a defendant's postconviction petition. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 37                                     A. Actual Innocence

¶ 38     On appeal, defendant argues a claim of actual innocence based on the recantation affidavit of Moore, which was attached to his petition. An actual innocence claim is cognizable under the Act because the conviction of an innocent person violates the due process clause of the Illinois Constitution. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). A review of the record reveals that, in his postconviction petition, defendant did not frame his claim as one of actual innocence but instead as one of ineffective assistance of counsel. There, he alleged that he was deprived of his constitutional right to effective assistance of counsel because, among other things, "counsel failed to investigate and discover that another committed the crime." He maintained below, as he does here on appeal, that had counsel investigated, he would have learned that "K.B." (Kenneth Brown), was the shooter. He maintained that had counsel investigated and interviewed Moore, he would have discovered the contents of Moore's affidavit, including his motivations for testifying as he did and information that Kenneth Bowen was the actual shooter that evening. The trial court, in reviewing defendant's petition, applied the legal test espoused in *Strickland v. Washington*, 466 U.S. 668 (1984), as was appropriate, and rejected the ineffective assistance claim.

¶ 39     Pursuant to the Act, "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2016). "[A]ny issue to be reviewed on appeal must be presented in the petition filed in the trial court" (*People v. Johnson*,

352 Ill. App. 3d 442, 449 (2004)), and may not be raised for the first time while the matter is on review (*People v. Jones*, 211 Ill. 2d 140, 148 (2004)). See *People v. Hunter*, 376 Ill. App. 3d 639, 643 (2007) (review of defendants ineffective assistance claim, which had not been alleged in the petition, was denied on appeal). In *People v. Jones*, we declined consideration where the defendant abandoned his claim of actual innocence and reformed it as a cause-and-prejudice theory on appeal. 2017 IL App (1st) 123371, ¶ 60.

¶ 40    "The question raised in an appeal from an order dismissing a post-conviction petition is whether the allegations in the petition, liberally construed and taken as true, are sufficient to invoke relief under the Act." *People v. Coleman*, 183 Ill. 2d 366, 388 (1998). In this case, it is clear that defendant's claim below was, for all intents and purposes, a claim of actual innocence and is framed as such here on appeal. Construing the petition liberally, as we must, we will review defendant's claim of actual innocence as the facts asserted here in support of that claim mimic those facts asserted in the petition in support of his ineffectiveness claim below.

¶ 41    Moore's recantation affidavit states that he lied in his testimony before the grand jury and at trial when he identified defendant as the shooter because he and defendant had argued days before the shooting regarding the mother of Moore's child. Moore knew at the time that Kenneth Bowen was the actual shooter, and that defendant was not present that evening. He also averred that he was worried that he was going to be charged with the shooting.

¶ 42    The requirements for establishing a claim of actual innocence are as follows:

> "[T]he defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [*People v. Washington*, 171 Ill. 2d 475, 489 (1996)]. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See [*People v. Burrows*, 172

- 12 -

Ill. 2d 169, 180 (1996)]. Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. [*People v. Molstad*, 101 Ill. 2d 128, 135 (1984)]. *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 43 We do not dispute that Moore's affidavit constitutes new, noncumulative, and material evidence. The deciding factor here, as with many cases involving a claim of actual innocence, is the conclusiveness of the new evidence. See *People v. Sanders*, 2016 IL 118123, ¶ 47 (stating that "the conclusiveness of new evidence is the most important element of an actual innocence claim"). Our supreme court recently addressed the conclusive-character element in *Robinson*, 2020 IL 123849, ¶¶ 48, 56, and stated that it "need not be entirely dispositive" but "requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment." "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id* at 48. We further note that the *Robinson* court found it "fundamentally illogical" to reject an actual innocence claim on the ground that the new evidence contradicts the trial evidence. *Id.* ¶ 57. In *Robinson*, the court's finding that the defendant satisfied the requirements for an actual innocence claim was largely based on the lack of physical or forensic evidence linking the defendant to the crimes and lack of eyewitness identification of the defendant's involvement in the crimes. *Id.* ¶ 82.

¶ 44 Here, not only is Moore's recantation contradicted by his own grand jury and trial testimony, but more importantly and in contrast to *Robinson*, there were three eyewitnesses (Metayer, Pearson, and Ford) who testified at trial that defendant had a gun on the night of the shooting. Specifically, Metayer, who was not affiliated with defendant in any way (she was not

even aware of defendant's name at the time of the shooting), unequivocally identified defendant as the shooter at trial. Pearson testified that he saw defendant with a gun, he saw Williams lying on the ground, and he saw defendant running away with a gun in his hand. Ford testified that he saw defendant pull out a gun and shoot at someone. Additionally, Rodwell, according to his statement to police, saw defendant with a gun during the fight, and Jerry, according to his statement to police, saw defendant shoot Williams, though they both recanted their statements to the police at trial.

¶ 45     Even without assessing the veracity of Moore's affidavit, these facts overwhelmingly implicate defendant as the shooter, and we do not find that there is a probability that a fact finder would reach a different result on retrial. See *People v. Morgan*, 212 Ill. 2d 148, 155 (2004) (stating that because "the recantation of testimony is regarded as inherently unreliable[,] *** the courts will not grant a new trial on that basis except in extraordinary circumstances"). Simply put, we cannot say that Moore's affidavit undermines our confidence in the trial court's finding of guilt. For these reasons, we conclude that defendant has not presented a colorable claim of actual innocence and the trial court correctly dismissed this claim.

¶ 46                              B. Ineffective Assistance of Trial Counsel

¶ 47     Defendant next contends that his trial counsel was ineffective because he failed to investigate and interview Charel Johnson as a potential alibi witness. In his postconviction petition, defendant claims that Johnson would testify that defendant was with her all evening on March 31, 2006 and until the morning of April 1, 2006. Defendant stated in his petition that he was unable to attach her affidavit to his petition because her correspondence was rejected by the Department of Corrections for failing to include his inmate number. The State responds that from the time of defendant's conviction up until the filing of this postconviction petition, defendant had ample time

to remedy the absent inmate number and to obtain Johnson's affidavit. The State further argues that defendant has failed to discharge his obligation to present supporting documentation under the Act.

¶ 48 We first address the sufficiency of defendant's petition pursuant to the requirements contained in section 122-2 of the Act. A defendant's petition must "clearly set forth the respects in which petitioner's constitutional rights were violated" and have attached affidavits, records, or other evidence supporting its allegations. 725 ILCS 5/122-2 (West 2016). If supporting documentation is not attached, the petition must explain why. *Id.* The purpose of the supporting documentation requirement is to demonstrate that the petition's allegations are "capable of objective or independent corroboration." *People v. Collins*, 202 Ill. 2d 59, 67 (2002). "The failure to either attach the appropriate supporting material or explain its absence justifies the summary dismissal of a petition." *People v. Reed*, 2014 IL App (1st) 122610, ¶ 40; see also *People v. Delton*, 227 Ill. 2d 247, 255 (2008) (if petition is not properly supported than it is unnecessary to determine whether it set forth the gist of a constitutional claim).

¶ 49 Defendant contends in his brief that it is not necessary for him to include an affidavit from Johnson because he has explained the absence of the affidavit and thus the requirements for a postconviction petition have been met.

¶ 50 Our supreme court has acknowledged the burdens of requiring the attachment of supporting documentation for postconviction petitioners and reiterated that the Act allows for attachment to be excused where the failure was explained. *People v. Collins*, 202 Ill. 2d at 68 (affirmed summary dismissal where the defendant did not explain the absence of supporting documentation and an explanation could not be inferred from the petition's allegations); see also *Delton*, 227 Ill. 2d at 258 (same). In addition to the statutory provision allowing for excuse of compliance, our supreme

court has carved out a judicial exception to the supporting documentation requirement whereby a lack of an affidavit and lack of an explanation is not fatal to a postconviction petition but only in cases where the defendant is claiming ineffective assistance of counsel and the only affidavit that would support his allegations would be from his trial counsel. *People v. Williams*, 47 Ill. 2d 1, 4-5 (1970) (where the court excused the lack of supporting documentation and absence of explanation because of the impossibility or difficulty in obtaining an affidavit from his trial counsel); *People v. Hall*, 217 Ill. 2d 324, 333-34 (2005) (where the court found the defendant's explanation for the absence of documentation to "easily be inferred from the allegations of his petition and affidavit" because only his counsel's affidavit could have supported his allegations and such would be difficult or impossible to obtain). We also note that there are countless cases, largely unpublished, where this court has refused to consider claims involving alibi witnesses that did not contain affidavits, or where the affidavits simply lacked notarization, and contained no explanation for their absence. For example, in *People v. Wideman*, 2013 IL App (1st) 102273, ¶ 18, we stated: "Had Wideman provided an explanation detailing why [the witnesses'] affidavits were not notarized, then he may have given the trial court a basis for consideration ***." Additionally, in *People v. Brown*, 2014 IL App (1st) 122549, ¶¶ 60-61, the court specifically noted that the defendant did not attach supporting documentation and did not include an explanation as to why they were absent. In contrast, here, defendant has arguably complied with the Act's requirement by providing an explanation as to the missing Johnson affidavit.

¶ 51    We are unable to identify any published cases that expand on what is required for an explanation to be sufficient. The only guidance we have on this matter is that incarceration, by itself, is not sufficient. See *People v. Harris*, 2019 IL App (4th) 170261, ¶ 19 ("[I]mprisonment, by itself, cannot excuse a defendant's failure to attach supporting material to a postconviction

petition."). Of course, here, defendant has explained that he was unable to secure the affidavit, due to no fault of his own, but because Johnson did not include his inmate number on her correspondence. Regardless, because the substance of defendant's allegations, notwithstanding their veracity, are insufficient to make even an arguable claim of ineffective assistance of counsel, we need not determine whether defendant's explanation was sufficient.

¶ 52    As stated above, first-stage postconviction petitions may only be summarily dismissed if they have no "arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 11-12. For a claim of ineffective assistance of counsel, we apply the well-known test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by Illinois courts in *People v. Albanese*, 104 Ill. 2d 504 (1984), although it is a less stringent standard under first stage proceedings. At this stage, a claim of ineffective assistance of trial counsel can only survive summary dismissal if: "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17. There is a strong presumption that counsel's performance fell within a wide range of reasonable assistance. *Strickland* at 690. It is defendant's burden to satisfy both prongs, thus courts may resolve ineffective assistance claims by deciding either of the prongs. *People v. Boyd*, 347 Ill. App. 3d 321, 329 (2004).

¶ 53    Defense counsel has a professional obligation "to explore all readily available sources of evidence that might benefit their clients." *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005). "For an attack on the competency of trial counsel to be successful, defendant must demonstrate the potential testimony of the witness trial counsel failed to call or contact." *People v. Morris*, 335 Ill. App. 3d 70, 85 (2002) (citing *People v. Guest*, 166 Ill. 2d 381, 402 (1995)). Trial counsel's failure to investigate or interview witnesses cannot rise to the level of ineffective assistance where the

attorney did not know and had no way of knowing of witnesses or evidence that would benefit their client's case. See *People v. Irvine*, 379 Ill. App. 3d 116, 130 (2008).

¶ 54    Here, defendant's petition did not include any allegations that he informed trial counsel of his alibi or that trial counsel should interview Johnson. Nor is there any evidence in the record that would indicate counsel should have known about Johnson or defendant's alibi. Because there are no allegations that counsel was apprised of the purported alibi witness by defendant, we cannot find that counsel was ineffective for failing to investigate or interview Johnson. See *People v. English*, 403 Ill. App. 3d 121, 137-38 (2010). Accordingly, defendant's claim has no arguable basis in fact or law, even if it had been supported by an affidavit from Johnson.

¶ 55                                    C. Sentence

¶ 56    Finally, defendant claims that his sentence of 110 years violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. For purposes of our review, we set forth the statutory provisions under which defendant was sentenced. The sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5–4.5–20(a) (West 2012). A sentencing enhancement of 25-years-to-life applies in cases where the defendant personally discharged a firearm that proximately caused the death of another during the commission of the offense. 730 ILCS 5/5–8–1(a)(1)(d)(iii) (West 2012). When a jury makes such a finding, the court must impose the sentencing enhancement, which runs consecutively to the sentence for the underlying offense. Thus, the applicable sentencing range in this case was 45 years to life. Defendant was sentenced to 50 years on the first-degree murder conviction and 60 years on the weapons discharge conviction. *People v. Fenton*, 2015 IL App (1st) 130861-U.

¶ 57                                1. Eighth Amendment

¶ 58    The eighth amendment prohibits "cruel and unusual punishments" and is applicable to the states through the fourteenth amendment. U.S. Const. amend. VIII; *People v. Davis*, 2014 IL 115595, ¶ 18. The United States Supreme Court addressed the effect of the eighth amendment on juvenile sentences in *Miller v. Alabama*, 567 U.S. 460 (2012), and its progeny. In *Miller*, the Court held that the eighth amendment is violated where a mandatory life sentence without parole is imposed upon a juvenile without consideration of the defendant's youth and its attendant characteristics. *Id.* at 479-80. In accordance with *Miller*, sentencing courts in homicide cases are required to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 480. The Court later held that *Miller* applied retroactively to collateral review cases (*Montgomery v. Louisiana*, 575 U.S. 911 (2016)), and our supreme court found that the reasoning of *Miller* also applies to discretionary life sentences for juveniles. *People v. Holman*, 2017 IL 120655, ¶ 40.

¶ 59    Significantly, however, *Miller* only applies to juvenile offenders and, as seemingly arbitrary as the line in the sand may be, our supreme court has not extended *Miller*'s reasoning to apply to adults. *People v. Harris*, 2018 IL 121932, ¶ 61 (citing *United States v. Williston*, 862 F.3d 1023, 1039-40 (10th Cir. 2017)). In the case at bar, defendant was 20 years old at the time of the offense and categorically not a juvenile offender. It has been established that defendants who are 18 years or older cannot raise a facial challenge to their sentence based on the eighth amendment and the *Miller* line of cases. *Harris*, 2018 IL 121932, ¶¶ 59-61. Thus, defendant's claim of an eighth amendment violation is unavailing.

¶ 60                              2. Proportionate Penalties Clause

¶ 61    The proportionate penalties clause of the Illinois Constitution extends greater protections against excessive punishment than the eighth amendment. *People v. Fernandez*, 2014 IL App (1st)

120508, ¶ 63 (stating that the "Illinois Constitution places greater restrictions on criminal sentencing than the eighth amendment's prohibition"). The clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill Const. 1970 art. I, § 11. A sentence violates this clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). This provision mandates the balancing of the goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and the community's changing standard of moral decency. *People v. Hernandez*, 382, Ill. App. 3d 726, 727 (2008).

¶ 62    We have closely examined defendant's petition and summarize the substance of his proportionate penalty claims in detail here. As his major premise, defendant asserts that his "aggregate (110)-year sentence is unconstitutionally excessive, disproportionate and fails to consider the 'mandatory language' of the constitution that 'all penalties should have the objective of restoring the offender to useful citizenship' where the confluence of the sentencing statutes, which the trial court was required to apply, is absolutely contrary to the constitutional objective of the rehabilitation clause, and fails to reasonably allow the sentencing court to fairly assess the 'mitigating factors' of youth, and individualized attendant characteristic's [sic], brain deficiencies, mental health, and other factor's [sic] before imposing an unsurvivable sentence." This premise is repeated throughout the 35 paragraphs devoted to defendant's disproportionate sentencing claim, with a constant and specific refrain regarding his rehabilitative potential, the constitutional requirement of restoring him to useful citizenship, and a litany of his post-sentencing conduct

which demonstrate that he is "salvageable with obvious rehabilitative potential." He further alleges that the trial court failed to give due consideration to his "serious mental health problems" and drug abuse. Defendant argues that "without considering the numerous mitigating factors associated with youth and mental health, the court concluded that he 'exhibited no redeeming value that [the court] could hang [its] hat on to say down the road [defendant] may be salvageable.' " He alleges throughout that the "interaction or confluence of [the] sentencing statutes prevented the court from exercising any discretion (or) taking into account his youth or rehabilitative potential."

¶ 63    We view defendant's proportionate penalties challenge as presenting two, although awkwardly interspersed, claims. The one claim, about which he most persistently advocates with supporting facts, is that the court failed to consider his rehabilitative potential and its constitutional requirement to consider restoring him to useful citizenship. The other claim is based on his youth. We first address those claims in the petition which we view as related to defendant's youth.

¶ 64    Citing *Miller v. Alabama*, 567 U.S. 460 (2012), defendant asserts that he is more similar to a "juvenile than a full-grown adult based on his mental health history, individual attendant characteristics and other mitigators factors." In the final two paragraphs of the petition, defendant returns to his earlier reference to *Miller*, and asserts, generally, that his record must contain information and factual development regarding how the " 'evolving science' of adolescent maturity and brain development should apply to the circumstances in this case." He then directs the court's attention to attached "validated 'science' and 'social science' studies" as exhibits, and finally, asserts that he must be given "the opportunity to sufficiently develop the record with the assistance of counsel due to his noted mental illness."

¶ 65    Even though an eighth amendment challenge based on *Miller* is essentially foreclosed for defendants over 18 years old, in at least two cases on direct appeal, our supreme court has

recognized that young adults (those under 21 years old) may rely on the evolving neuroscience regarding brain development in juveniles and its correlation to maturity underpinning the *Miller* decision in support of an as-applied challenge pursuant to the proportionate penalties clause of the Illinois Constitution. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44; *Harris*, 2018 IL 121932, ¶ 48. In *Thompson* and *Harris*, the court opened the door for young defendants to demonstrate that their own specific characteristics were so like those of a juvenile that imposition of a life sentence, absent the necessary considerations established in *Miller,* would violate the proportionate penalties clause. The court instructed, however, that such claims would best be pursued through a postconviction petition. *Thompson*, 2015 IL 118151, ¶¶ 43-44 (noting that a 19-year-old defendant was "not necessarily foreclosed" from asserting such a claim in postconviction proceedings); *Harris*, 2018 IL 121932, ¶ 48 (holding that the as-applied, youth-based sentencing claim of an 18-year-old defendant was "more appropriately raised" in postconviction proceedings).

¶ 66    In deciding *Thompson* and *Harris*, our supreme court had no occasion to provide any guidance on the precise allegations necessary in a postconviction petition to pass first-stage muster for a youth-based sentencing claim. However, we do not read either case to mandate summary remand by mere virtue of the fact that one may fall within the classification of a youthful offender. If that were the case, appellate review would not only be meaningless, but wholly unnecessary. Nevertheless, we are mindful that here we are confronted with defendant's initial postconviction petition, which requires for its viability that petitioner state merely the gist of a constitutional claim. It has long since been settled that at this stage, the postconviction petitioner is not expected and need not make legal argument or cite to legal authority. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). And, although the petition need only present a limited amount of detail, the petitioner must set forth the specific manner in which his rights were violated. *People v. Porter*, 122 Ill. 2d

64, 74 (1988). Thus, at the end of the day, it remains a requirement that to survive summary dismissal, the petition must allege something more than nonfactual and nonspecific assertions to support its claims. See *Morris*, 236 Ill. 2d at 354.

¶ 67    Other than generally alluding to his age at the time of the murder and attaching as exhibits research studies on juvenile maturity and brain development, defendant has presented no correlation between his age and the emerging brain science. His petition does not contain any allegation or argument that there is some specific characteristic, save those previously litigated, that could alter the trial court's sentencing decision if it were to conduct a full *Miller*-hearing. Other than the fact of his age, he offers not even a limited amount of detail to show the specific manner in which his right to a fair sentence was violated. Clear from the petition, however, is that defendant is aware of the developing caselaw on the issue of youth-based sentencing and takes advantage to include, almost verbatim, language from decisional law addressing the issue. Defendant's youth-based claim does no more than allege "nonfactual and nonspecific assertions that merely amount to conclusions," which are insufficient to survive summary dismissal. *Morris*, 236 Ill. 2d at 354. Thus, we hold that the trial court's summary dismissal of defendant's youth-based proportionate penalties claim was proper.

¶ 68    We next consider defendant's rehabilitation potential claim. In support of his argument, defendant argues that although courts have sentencing discretion, the constitution requires that "all penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." He argues that the court must consider the nature and circumstances of the crime, as well as the personal history of the offender, his age, demeanor, habits, mentality, credibility, character criminal history, general moral character, social environment and education, as well as the mitigating factors associated with "youth adolescents."

¶ 69    "The purpose of the post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction that have not already been adjudicated or that could have been." *People v. Silagy*, 116 Ill. 2d 357, 365 (1987). "[W]hen evaluating a petition, a trial court 'may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceedings.' " *People v. Blair*, 215 Ill. 2d 427, 445 (2005) (quoting 725 ILCS 5/122-2.1(c) (West 2002)). Issues that were litigated at trial, or on direct appeal are barred by *res judicata*. *Id*. Where *res judicata* precludes a postconviction petitioner from obtaining relief, the claims asserted therein are therefore frivolous and patently without merit. *Id*.

¶ 70    We note initially that in reviewing the transcripts of defendant's pretrial fitness hearing, not only was defendant determined fit for trial, but the testifying doctor stated that he did not observe any symptoms of mental illness on the part of the defendant. Further, at sentencing, the trial court noted that defendant had been diagnosed as bipolar. Thus, defendant's claims of mental illness and that the court failed to consider that he was bipolar are factually rebutted by the record.

¶ 71    In evaluating the merits of defendant's petition, the trial court determined that defendant's argument was barred by *res judicata* as the same claims presented in the petition had been raised and decided on direct appeal. We agree. Defendant's claims here are not significantly different from his claim on direct appeal where he contended that the trial court failed to adequately consider mitigating factors at his sentencing hearing. *Fenton*, 2015 IL App (1st) 130861-U, ¶ 46. There, he specifically argued that the trial court did not give sufficient weight to his young age, mental illness, and rehabilitative potential. *Id*. Defendant's postconviction claims, now framed in the context of a proportionate penalties violation, read along those same lines, that is, that his sentence

was excessive where the sentencing court failed to consider certain mitigating factors, including his rehabilitative potential.

¶ 72    Not only does the record before us demonstrate that the sentencing court considered all of the necessary factors in mitigation and aggravation, but also this court previously scrutinized the sentencing court's decision making on direct appeal. The sentencing court reviewed the PSI and considered defendant's past juvenile adjudications and adult criminal convictions. Information available to the sentencing court was to the effect that as a juvenile, defendant was found liable for theft. As an adult, defendant had been convicted of cruelty to animals, manufacture/delivery of cannabis, and possession of cocaine. Defendant had additionally been twice convicted of unlawful use of a weapon by a felon and was multiple years removed from our society's demarcation of a juvenile.

¶ 73    On review, we rejected defendant's sentencing claims and found that the court "was very thorough as it discussed all of the statutory mitigating and aggravating factors" and considered the information contained in defendant's PSI, including his age and bipolar diagnosis. *Id.* ¶¶ 51, 53-55.  We specifically pointed out the sentencing court's comment that defendant's rehabilitative potential "on a scale of one to ten [is] probably a zero." We need not replicate our entire analysis here. We would, however, emphasize that our analysis of defendant's sentencing proceedings was far from cursory. Having again reviewed those proceedings, we find that the sentencing court conducted a full and fair sentencing hearing, which resulted in defendant's 110-year sentence, due in large part to the seriousness of the offense, defendant's criminal history, and his rehabilitation potential. A finding that, incidentally, addresses in the main, defendant's proportionate penalties claim here.

¶ 74    We recognize that defendant's potential sentence had a mandatory minimum of 45 years (20 years for first degree murder and 25 years for the firearm enhancement, served consecutively). Although the court was required to add the firearm enhancement, it was not constrained in deciding the appropriate range either for murder or the firearm enhancement. In the exercise of its discretion, the court chose to impose a harsher sentence based on the seriousness of the offense and defendant's criminal history. Defendant's proportionate penalties claim, like his sentencing claim on direct appeal, which alleges that the trial court failed to properly consider mitigation factors, does not compel yet another rehashing of the sentencing court's deliberations and, in fact, is barred by *res judicata*.

¶ 75    *Res judicata* aside, when we consider, in its totality, defendant's prior convictions, the manner in which this crime was committed, and the seriousness of the same, we cannot say that defendant's sentence, though substantial, was so disproportionate to the offense as to shock the moral sense of the community. Thus, we find defendant's rehabilitation potential based proportionate penalties claim  to be frivolous  and without merit.

¶ 76    Accordingly, we affirm the court's summary dismissal of defendant's postconviction petition.

¶ 77                                III. CONCLUSION

¶ 78    For the reasons stated, we affirm the judgment of the circuit court.

¶ 79    Affirmed.

¶ 80    JUSTICE FITZGERALD-SMITH, dissenting:

¶ 81    With greatest respect, I would reverse the trial court's first-stage, summary dismissal of the defendant's postconviction petition. It is well-established that a postconviction petition may only be dismissed at this stage if it "is frivolous or is patently without merit" (725 ILCS 5/122-2.1(a)(2)

(West 2018)), meaning it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). In numerous decisions, this court and other districts of the appellate court have reversed trial courts that have either summarily dismissed postconviction petitions at the first stage or denied leave to file successive postconviction petitions, where offenders age 18 or older have raised claims that in light of recent developments in brain science, the lengthy sentences imposed on them without consideration of their youth and rehabilitative potential violated the proportionate penalties clause as applied to them, regardless of the violent nature of the offense, the offender's level of involvement in it, the discretionary nature of the sentence, what evidence was actually presented or considered at the sentencing hearing, or the absence of factual allegations in the petition setting forth how the evolving science of juvenile maturity and brain development applied to the offender's specific circumstances. See, *e.g.*, *People v. Chambers*, 2021 IL App (4th) 190151, ¶ 81; *People v. Savage*, 2020 IL App (1st) 173135, ¶ 76; *People v. Ross*, 2020 IL App (1st) 171202, ¶¶ 28-30, *People v. Franklin*, 2020 IL App (1st) 171628, ¶¶ 68-69; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 2, 34; *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 1, 38-40; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 1-2, 15-16; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 47; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14. Based upon the existence of these cases, I cannot say that the claim in this petition meets the standard of having "no arguable basis either in law or in fact," and I would advance the petition for second-stage postconviction proceedings.