# Illinois Official Reports

## Appellate Court

---

### *People v. Ruhl*, 2021 IL App (2d) 200402

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD E. RUHL, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0402 |
| Filed | September 21, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 02-CF-2183; the Hon. James K. Booras, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | John R. Storino, Sarah L. Futernick, and Miriam J. Wayne, of Jenner & Block LLP, of Chicago, for appellant.<br><br>Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Lynn M. Harrington, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Justices McLaren and Hudson concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Ronald E. Ruhl, appeals the trial court's denial of his motion for leave to file a second successive postconviction petition alleging actual innocence as well as a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons that follow, we reverse and remand for second-stage postconviction proceedings.

## I. BACKGROUND

¶ 3    The following facts come from the transcript of defendant's trial, the common-law record, defendant's second successive postconviction petition, and attachments to that petition. We will supplement the facts as needed in the analysis section.

### A. The Victim's Body Is Discovered in Wisconsin

¶ 5    On the morning of January 6, 2002, Lake County sheriff's deputy John Krempotic was patrolling eastbound on State Line Road near old Route 41 when he saw a car with Illinois license plates parked at the entrance to the Bristol Renaissance Faire in Kenosha County, Wisconsin. The fair was closed for the winter. Upon inspection, Krempotic observed damage to the closed entrance gate to the fairgrounds that corresponded to damage to the vehicle's front. When Krempotic peered inside the passenger-side window, he saw a white male slumped face down in the front passenger seat. The man appeared to have "massive" head injuries.

¶ 6    The deceased male inside the car was identified as 27-year-old Richard "Rick" Neubauer. Neubauer had sustained three gunshot wounds: one bullet had entered his skull near his left eyebrow, another had entered the back of his head, and yet another had entered the back of his neck. According to the Kenosha County medical examiner, Dr. Maureen Lavin, it was impossible to say which bullet wound was inflicted first, although all three were inflicted while Neubauer was still alive. Both shots to the head were fatal. No firearm, bullets, or bullet casings were found at the scene.

¶ 7    The police discovered a shoe print in the frozen gravel outside the car's driver's-side door. It appeared to be a man's, approximately size 11 or 12. Because of the frozen conditions, nothing further could be ascertained concerning the footwear impression. Later, the Wisconsin Department of Justice Crime Laboratory recovered three fingerprints from the car. One belonged to Denise Schubat, Neubauer's romantic partner and the mother of his young daughter. The other two were unrelated to this case. None of the fingerprints belonged to defendant. The crime laboratory also recovered hairs from the vehicle, none of which were consistent with defendant's hair. The police recovered Neubauer's phone from the car and found a message from Schubat, received in the early morning hours of January 6, 2002, asking where he was.

¶ 8    During the subsequent investigation, authorities determined that the firearm used to kill Neubauer was a .32-caliber top-break revolver. Top-break revolvers had not been manufactured since the 1940s. The gun used to kill Neubauer was never recovered by the police.

¶ 9                                    B. The Traffic Stop

¶ 10    On January 6, 2002, at 5:17 a.m., Waukegan police officer Keith Lamanna stopped a car driven by Raymond Serio. He described Serio as heavyset with devil horns tattooed on his shaved head. Defendant was in the front passenger seat. Because Serio was not satisfactorily answering Lamanna's questions, Lamanna obtained permission to search the car. He found a bottle of open liquor. As neither Serio nor defendant appeared intoxicated, the officer poured out the liquor and made no arrests.

¶ 11                                   C. Raymond Serio

¶ 12    Serio and his brother were co-owners of Whiplash Bar & Grill (Whiplash), near Antioch, Illinois. Whiplash was a short distance from the Bristol Renaissance Faire. Defendant had done construction work at the bar and was frequently in Serio's company. Defendant drove Serio to and from work. Serio hired Schubat as a bartender at Whiplash. Customarily, Neubauer picked Schubat up there after 2 a.m. He would wait inside his car in the parking lot until she finished work. Serio knew Neubauer by sight.

¶ 13    The following facts are taken from our 2005 opinion addressing Serio's direct appeal from his conviction for first degree murder (720 ILCS 5/9-1 (West 2002)), arising from Neubauer's death. On April 4, 2002, Lake County sheriff's detective Timothy Jonites and another detective interviewed Serio. *People v. Serio*, 357 Ill. App. 3d 806, 810 (2005). Serio told the police the following. In November 2001, he and Schubat began a romantic relationship. *Serio*, 357 Ill. App. 3d at 810. Three weeks later, Schubat complained to Serio that Neubauer would always be in her life unless he were dead. *Serio*, 357 Ill. App. 3d at 810. Serio ignored Schubat at first but eventually said that he could " 'set it up.' " *Serio*, 357 Ill. App. 3d at 810. When Serio told Schubat that defendant would kill Neubauer, Schubat said that defendant was not " 'man enough' " to do it. *Serio*, 357 Ill. App. 3d at 810. On the night that Neubauer was killed, Serio was with Schubat inside Whiplash. *Serio*, 357 Ill. App. 3d at 810. Defendant was outside in the parking lot, where Neubauer was in his car, waiting for Schubat. *Serio*, 357 Ill. App. 3d at 810. Serio and defendant were talking on their phones, which functioned as walkie-talkies. *Serio*, 357 Ill. App. 3d at 810. Defendant asked Serio if he really wanted Neubauer to die. *Serio*, 357 Ill. App. 3d at 811. Serio told defendant: " 'I don't wanna hear nuttin'. All I wanna hear is [*sic*] gunshots.' " *Serio*, 357 Ill. App. 3d at 811. Not believing that defendant would kill Neubauer, Serio was shocked when he heard a gunshot from outside. *Serio*, 357 Ill. App. 3d at 811. Serio looked outside and saw defendant standing next to Neubauer's car. *Serio*, 357 Ill. App. 3d at 811. Serio saw that Neubauer's jaw was quivering. *Serio*, 357 Ill. App. 3d at 811. Neubauer was not dead. *Serio*, 357 Ill. App. 3d at 811. Schubat went home, and defendant rolled Neubauer into the passenger seat of his car. *Serio*, 357 Ill. App. 3d at 811. Defendant drove Neubauer to the Bristol Renaissance Faire, and Serio followed in his own car. *Serio*, 357 Ill. App. 3d at 811. Serio was afraid that defendant would kill him or his family if he refused to cooperate. *Serio*, 357 Ill. App. 3d at 811. Defendant rammed Neubauer's vehicle into a fence at the fairgrounds and then shot Neubauer several more times. *Serio*, 357 Ill. App. 3d at 811. Defendant rolled the gun and latex gloves that he was wearing into his sweater and placed the bundle under the hood of Serio's car. *Serio*, 357 Ill. App. 3d at 811. At about 4 a.m., police stopped them in Waukegan. *Serio*, 357 Ill. App. 3d at 811. The officer searched the car, but he found only an open bottle of tequila in the trunk. *Serio*, 357 Ill. App. 3d at 811. The officer poured out the liquor and allowed defendant and Serio to leave the scene. *Serio*, 357 Ill. App.

- 3 -

3d at 811. Serio drove defendant to a hotel where he was staying, and then Serio went home. *Serio*, 357 Ill. App. 3d at 811. At this time, defendant owed Serio $2500 for drugs. *Serio*, 357 Ill. App. 3d at 811. Serio stated that Schubat would receive $20,000 in life insurance from Neubauer's death. *Serio*, 357 Ill. App. 3d at 811.

¶ 14 On April 6, 2002, Serio was arrested for his participation in Neubauer's murder. *Serio*, 357 Ill. App. 3d at 808. The State charged Serio with first degree murder, based on the theory that he ordered defendant to shoot Neubauer. *Serio*, 357 Ill. App. 3d at 808. At Serio's trial, the State introduced his confession. *Serio*, 357 Ill. App. 3d at 812. The State also presented the testimony of Amanda Barbaro. Barbaro testified that she and Serio began a romantic relationship two or three weeks after Neubauer's murder. *Serio*, 357 Ill. App. 3d at 812. In February 2002, Serio told Barbaro that he shot Neubauer at the Bristol Renaissance Faire because Neubauer was not yet dead. *Serio*, 357 Ill. App. 3d at 812. Serio also told Barbaro that he hid the gun under the hood of his car. *Serio*, 357 Ill. App. 3d at 812. A jury found Serio guilty, and the court sentenced him to 50 years' imprisonment. *Serio*, 357 Ill. App. 3d at 808.

¶ 15 D. Defendant's Jury Trial

¶ 16 1. *The State's Motion in Limine to Exclude Marcy McIntosh's Testimony*

¶ 17 According to a police report attached as an exhibit to defendant's second successive postconviction petition, on August 19, 2002, Jonites met with a cooperating witness who reported that Serio had confided his "involvement" in Neubauer's murder to a woman named "Marcy." This witness described the area where "Marcy" lived and stated that "Marcy" and her husband "Jim" were the holders of Whiplash's liquor license.[1] We will refer to Jonites's report of this interview as the "Marcy report."

¶ 18 Marcy McIntosh was the "Marcy" to whom the Marcy report referred. That report was not tendered to defendant in discovery. Nevertheless, defendant's counsel disclosed "Marcy" as a defense witness two days before defendant's scheduled trial. The State moved *in limine* to bar her testimony on hearsay grounds.

¶ 19 McIntosh testified to the following at the hearing on the State's motion *in limine*. She had known Serio for about a year and a half. At first, she was a customer at Whiplash, and then she started tending bar there in January 2002, after Neubauer's murder. According to McIntosh, she and Serio would discuss matters other than business. In April 2002, on the day before Serio's arrest, she was bartending at Whiplash. Serio was present. McIntosh's fiancé, Jim, was also present. McIntosh asked Serio why the police were questioning him about Neubauer's murder if he had nothing to do with it. Serio said: "What do you mean I had nothing to do with it? I did it." Serio told McIntosh that he shot Neubauer once in Whiplash's parking lot but, when he did not die, Serio shot him more times. Serio did not say where the other shots occurred. Serio said that Neubauer was a "punk and didn't deserve to live and [Schubat and her daughter] would be better off without him." McIntosh testified that Jim "got up and walked away" as soon as Serio said, "I did it." According to McIntosh, Serio was clear and "straight" when he said this to her. McIntosh testified that Serio did not drink. McIntosh testified that Serio took her van and cell phone that night and returned them the next day.

---

[1]Sometime after the murder, Marcy McIntosh and her then-fiancé Jim Natywa bought Serio's half-interest in Whiplash.

¶ 20    On cross-examination, McIntosh agreed that she had declined to talk to the prosecutor prior to her testimony. She testified that she first met Serio in November 2001 as a customer at Whiplash. She and Jim drank there every night after work. Sometimes they had a couple of drinks, and other times, they would "close the bar." McIntosh testified that they drank "on the house" because Jim and the Serio brothers were from the same southside neighborhood. According to McIntosh, she allowed Serio to use her car and her cell phone, although he would also take them without her permission. She testified that Serio permitted her to see things he would not have shown to everyone, but he did not seek her advice on personal matters. When Serio told McIntosh that he shot Neubauer, he also said that Schubat was standing behind the bar when Neubauer was shot. According to McIntosh, Serio never implicated Schubat in planning the murder. McIntosh testified that she did not go to the police because, "with [Serio's] connections and what I know of him," she would rather not get involved. However, according to McIntosh, she was defendant's friend, and she decided to come forward when she learned that he had been charged with Neubauer's murder.

¶ 21    The court granted the State's motion to bar McIntosh's testimony. The court found, *inter alia*, that McIntosh and Serio were not close acquaintances, thus undermining the trustworthiness of his confession to her. See *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973) (discussing the factors relevant to the admissibility of hearsay statements that someone other than the defendant committed the crime for which the accused stands trial).

¶ 22                              2. *The Evidence at Defendant's Trial*
¶ 23                                a. *The State's Case-in-Chief*
¶ 24    In addition to testimony relating to the discovery of Neubauer's body, his death, and the early-morning traffic stop, the State presented the following evidence. Neubauer and Schubat had an on-again, off-again relationship, although they compatibly parented their daughter. Neubauer and Schubat resumed their relationship in November 2001. In the early morning hours of January 6, 2002, Neubauer borrowed his mother's car to pick Schubat up after work at Whiplash.

¶ 25    Kristen Koets, Serio's fiancée, had obtained a Firearm Owner's Identification card at Serio's insistence. In December 2001, she drove Serio and defendant to a Bass Pro Shop where she purchased ammunition for a handgun at Serio's suggestion. Defendant stayed in the car. Koets then drove Serio and defendant to a hotel in Antioch. At Serio's direction, Koets gave the shopping bag containing the box of bullets to defendant. Serio and defendant went inside the hotel together.

¶ 26    In late November or early December 2001, Serio asked Derrick Banks to get him a gun.[2] Defendant was present with Serio when Serio made that request, although defendant did not say anything. Banks told Serio that he could not obtain a gun for him.

¶ 27    Schubat testified as follows. She was 25 years old at the time of trial. Schubat and Neubauer began a romantic relationship when she was 18. Their daughter was born when she was 20. They lived together for a couple of years, but problems developed, and Schubat moved out with their daughter. According to Schubat, she and Neubauer continued their romantic

---

[2]In his affidavit in support of defendant's second successive postconviction petition, Serio denied that he asked Banks to get him a gun.

relationship, and he always paid child support, plus extras, when she needed it. Gradually, though, she and Neubauer drifted apart.

¶ 28 Schubat began tending bar at Whiplash in August 2001. Serio worked nights with her. According to Schubat, Serio became overly friendly and "very grabby." Schubat had known defendant as a friend for about a year before she started working at Whiplash. As soon as she started working at Whiplash, she saw defendant and Serio together. According to Schubat, no one spent more time with Serio than defendant. Serio and defendant communicated constantly on phones that operated like walkie-talkies.

¶ 29 Schubat testified that, one night in October 2001, she drove Serio to a hotel where he was staying because defendant was too busy to pick Serio up from work. Serio supplied Schubat with cocaine, and she stayed the night with him. The next morning, disgusted with herself, Schubat told Serio that it would not happen again. According to Schubat, Serio continued to pursue her.

¶ 30 Around Thanksgiving 2001, Schubat resumed a romantic relationship with Neubauer. She described their relationship as "wonderful." Schubat testified that Neubauer would pick her up at Whiplash after work at 2 a.m. and they would cruise the "clubs" in Chicago until 6 a.m.

¶ 31 According to Schubat, she, Serio, and defendant were in Whiplash's kitchen about a week before the murder. Serio commented that he and defendant were going to kill Neubauer. Defendant stated: "Well, okay, only if [Schubat] doesn't get mad at me." Because Serio and defendant were laughing about it, Schubat did not take them seriously.[3]

¶ 32 Around the same time as the kitchen conversation, Schubat saw a gun in a drawer behind the bar. She described it as resembling guns in old Western movies. She told Serio to get it out of there because the police were constantly checking for drunk drivers and she did not want trouble.

¶ 33 Schubat testified that, on the night of January 4, 2002, Serio asked her out, and when she told him that she was going out with Neubauer, he became upset. Serio instructed her to call him as soon as she got home. Schubat thought that Serio was joking because he was laughing as he said this. When Schubat got to Whiplash on January 5, 2002, Serio asked why she had not called him the night before. According to Schubat, Serio was "aggravated," and he "stormed" away from her. However, during her shift, Serio asked Schubat what she and Neubauer did the night before. According to Schubat, Serio also said that he would "get rid of" Neubauer so that he and Schubat could be together. Schubat told Serio that he was "crazy."

¶ 34 Schubat testified that defendant arrived at Whiplash around 10 p.m. on January 5. Defendant and Serio went into the kitchen to talk. Schubat went into the kitchen, but when she stuck her head in the door, they "both shut up right away." Around 10:30 or 10:45 p.m., Serio came out of the kitchen without defendant. Schubat assumed that defendant had left Whiplash by the back door. According to Schubat, she went to the drawer behind the bar for aspirin. The gun was gone. She had not seen anyone take it.

¶ 35 At 2 a.m., Schubat and Serio closed the bar and locked the main entrance. She was expecting Neubauer to arrive any minute. However, she and Serio were alone in the bar. Serio was on his walkie-talkie phone. He asked whomever he was talking to whether the "green four-

---

[3]In his affidavit in support of defendant's second successive postconviction petition, Serio denied that this "kitchen conversation" occurred.

- 6 -

door car" was still in the parking lot. Schubat knew that Neubauer was driving his mother's car matching that description. According to Schubat, she heard defendant's voice over the phone say "Yes." Serio then asked defendant to shoot Neubauer. Schubat testified that she thought that Serio was "crazy," because he had a smirk on his face and was being sarcastic. When Schubat tried to leave the bar, Serio pushed her and told her that she was not going anywhere. Schubat became worried. According to Schubat, Serio again told defendant to shoot Neubauer. Defendant said, "Are you sure?" Then, Serio said, "I want to hear a gunshot."

¶ 36     Thirty seconds later, Schubat heard a gunshot. She jumped over the bar, looked out a window into the parking lot, and saw Neubauer slumped over in his car. According to Schubat, a light shone through the car's windshield, and she saw Neubauer's jaw quiver. Serio told her to go home and to call Neubauer's cell phone.

¶ 37     Next, Schubat heard pounding on the main entrance, and then she heard glass breaking. According to Schubat, defendant came through the door and went into the kitchen. Then, defendant returned to the bar. Defendant was pacing while holding his head. Schubat testified that defendant put the gun that had been in the drawer on the end of the bar. Schubat testified that the gun looked broken. She identified it as being similar to the top-break revolvers that the prosecution showed her.

¶ 38     According to Schubat, defendant told Serio that they needed to hurry up and get rid of the body. Serio told her to go home and ensure that no one knew that Neubauer was at Whiplash if she wanted her daughter to be safe. Serio watched her get into her car and leave. When she got home about 2:43 a.m., she called Neubauer's cell phone and left a message.

¶ 39     The next day, Neubauer's mother called Schubat asking if she had seen Neubauer. Schubat denied having seen him. Schubat testified that she denied knowing what happened when speaking to the police multiple times over the next four months because she was "terrified" that something would happen to her daughter. Schubat denied that she had asked anyone to kill Neubauer.

¶ 40     On cross-examination, Schubat testified that, when she went into the drawer behind the bar to get aspirin, the gun was there, wrapped in a blue towel. Schubat said the bar towels were blue, so she grabbed the towel, which exposed the gun. She did not see defendant near that drawer or see him remove the gun. She testified that, after the shooting and defendant reentering the bar, she did not see him place the gun on the bar. According to Schubat, she was not paying attention to how the gun got onto the bar. She testified: "I looked up, and it was there."

¶ 41                              b. *Defendant's Case-in-Chief*

¶ 42     Following the court's denial of defendant's motion for a directed verdict, defendant presented two witnesses on his behalf. Jonites testified that he collected hair and blood samples from defendant and delivered those items to the Northern Illinois Crime Laboratory. Sandra Morton, a friend of Schubat's, testified that Schubat complained about Neubauer throughout their relationship. Morton testified that in December 2001 Neubauer was threatening to take custody of their daughter because of Schubat's "lifestyle." Morton testified that she knew that defendant had done remodeling work at Whiplash. She identified photographs depicting the interior of Whiplash.

¶ 43                                  c. *The State's Rebuttal*

¶ 44        Jennifer Kilarski testified that Schubat was her best friend. She testified that, after Schubat and Neubauer got back together during the last six or eight weeks of his life, he and Schubat were very happy. According to Kilarski, they had no arguments over their daughter.

¶ 45        Tricia Czeszewski was Neubauer's sister. She testified that their relationship was very good after Schubat and Neubauer got back together around Thanksgiving 2001. According to Czeszewski, there was no controversy over their daughter's custody.

¶ 46        The jury found defendant guilty. After the court denied defendant's posttrial motion, it sentenced him to 50 years' imprisonment. Defendant appealed, and this court affirmed defendant's conviction and sentence. *People v. Ruhl*, 354 Ill. App. 3d 1171 (2004) (table). Our supreme court denied defendant's petition for leave to appeal.

¶ 47                          E. Defendant's Postconviction and First
                              Successive Postconviction Petitions

¶ 48        On November 22, 2005, defendant, through counsel, filed a postconviction petition alleging ineffective assistance of trial counsel. On February 10, 2006, the court dismissed this petition as frivolous and patently without merit. This court affirmed in *People v. Ruhl*, 376 Ill. App. 3d 1148 (2007) (table), and our supreme court denied leave to appeal. On August 5, 2008, defendant, *pro se*, filed a petition for leave to file a successive postconviction petition. Defendant alleged that his initial postconviction petition was fundamentally deficient because postconviction counsel failed to include allegations that defendant's appellate counsel had rendered ineffective assistance. On November 18, 2008, the trial court denied defendant leave to file a successive postconviction petition. This court affirmed (*People v. Ruhl*, 397 Ill. App. 3d 1113 (2010) (table)), and our supreme court denied leave to appeal.

¶ 49                          F. Defendant's Motion for Leave to File a
                              Second Successive Postconviction Petition

¶ 50        On December 6, 2018, defendant, through new counsel, filed a motion for leave to file a second successive postconviction petition. Defendant presented a claim of actual innocence, and he also argued that the State violated *Brady* in failing to disclose the Marcy report.

¶ 51        In support of his actual-innocence claim, defendant attached Serio's affidavits dated March 7, 2014, and August 24, 2015. Serio averred that he alone murdered Neubauer and that he forced defendant to help him dispose of the body. Defendant also attached the affidavits of McIntosh and Jim Natywa dated November 16, 2005, stating that Serio confessed to McIntosh that he had murdered Neubauer. McIntosh reaffirmed her affidavit on August 9, 2016, and Natywa reaffirmed his affidavit on June 23, 2016. Additionally, defendant included the affidavit of Tracy Patterson, dated April 29, 2016, who stated that Serio and his brother offered to "take care of" her abusive boyfriend. Patterson averred that Serio said, "we can make him go away" around the time of the Neubauer murder. In addition, Patterson averred that Schubat complained to her that Neubauer was "an a*** [who] never paid child support." On June 25, 2020, in a written memorandum and order, the court denied defendant leave to file his second successive postconviction petition. Defendant timely appealed.

## II. ANALYSIS

Defendant contends that the court (1) applied the wrong legal standards in assessing his claim of actual innocence, (2) relied on evidence outside the record, (3) ignored that defendant put forth a colorable claim of actual innocence, and (4) applied the wrong legal standard in denying his *Brady* claim.

### A. Illinois Supreme Court Rule Violations

Before proceeding to the merits, we must address defendant's violation of supreme court rules in his amended opening brief. This court granted the State's motion to strike defendant's opening brief because it contained an argumentative statement of facts. We gave defendant leave to file an amended brief. In the amended brief, as "Background," defendant recites the contents of his second successive postconviction petition as though they were adjudicated facts rather than mere first-stage allegations that may never even reach an evidentiary hearing. Only a reader familiar with the record would discern this. Particularly egregious is the recitation— as though of proven facts—of conclusions by investigating police officers concerning Schubat's credibility, which are contained in police reports. In addition, the amended statement of facts barely touches on the evidence presented at defendant's trial but, instead, summarizes it so that it reads like the defendant's closing argument. Then, defendant includes a procedural history, which is nothing more than an argumentative overview of his brief.

Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) provides, *inter alia*, that a statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment." Defendant's amended brief blatantly violates this rule. The cause of advocacy is not served by attempting to dupe the court or willfully violating our supreme court rules, which are not mere suggestions but have the force of law and should be followed. See *People v. Glasper*, 234 Ill. 2d 173, 189 (2009). We would be well within our discretion were we to dismiss this appeal. See *MIFAB, Inc. v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 181098, ¶ 33. Nevertheless, we decline to do so. Owing to defendant's frequent appeals, we are familiar with the accurate facts here. However, we impose the sanction of striking the statement of facts, as defendant received fair warning that we expect him to conform to the applicable rules.

We also strike defendant's "Nature of the Case" section as being argumentative. Illinois Supreme Court Rule 341(h)(2) (eff. Oct. 1, 2020) provides that the appellant's brief shall contain an introductory paragraph stating (1) the nature of the action and the judgment appealed from and whether the judgment is based upon a jury verdict and (2) whether any question is raised on the pleadings and, if so, the nature of the question. This section may not include argument. *Conservatorship Estate of Black v. Black*, 2019 IL App (1st) 181452, ¶ 11. In violation of the rule, defendant included his entire theory of why he should prevail on appeal.

### B. Whether the Court Properly Denied Leave
### to File the Second Successive Petition

We turn now to the merits. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) affords a remedy to a petitioner whose federal or state constitutional rights were substantially violated in his or her original trial or sentencing hearing. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). The Act contemplates the filing of only one

postconviction petition. *Pitsonbarger*, 205 Ill. 2d at 456. However, the prohibition against successive proceedings is relaxed where the petitioner can establish cause and prejudice for failure to assert a postconviction claim in an earlier proceeding or where a petitioner asserts a miscarriage of justice based on actual innocence. *People v. Robinson*, 2020 IL 123849, ¶ 42. We review *de novo* the denial of leave to file a successive postconviction petition based on both those grounds. *Robinson*, 2020 IL 123849, ¶¶ 39-40.

¶ 60                    1. *Defendant's Claim of Actual Innocence*

¶ 61    Defendant contends that his second successive petition and supporting affidavits establish a colorable claim of actual innocence. Years after both defendant's trial and Serio's trial, Serio furnished two affidavits confessing that he shot Neubauer and coerced defendant into helping him dump the body at the Bristol Renaissance Faire. We will refer to these collectively as the Serio affidavit.

¶ 62    Serio's first affidavit was handwritten and sworn to on March 7, 2014. In that affidavit, Serio stated that Schubat told him that Neubauer was physically abusive toward her and would not pay child support. Schubat also told Serio that, if Neubauer were dead, she would receive insurance and "government money" for her daughter. Serio stated that he kept a .32-caliber revolver in his pocket in case he was robbed. Serio stated that Schubat knew about his gun and started complaining to him about Neubauer after she first saw the gun. On the night in question, Serio, who was "enraged" by Neubauer's behavior toward Schubat, tapped on Neubauer's driver's side window and then shot him in the head. When Serio told Schubat what he had done, Schubat "freaked out" about what they would do with the body. Serio told her to go home and call Neubauer's cell phone. Serio said that he would enlist defendant in helping him dispose of the body. Serio stated that he and Schubat agreed to tell authorities that they were both inside Whiplash when defendant shot Neubauer. Serio stated that he told defendant to move a drunk who had passed out in his car over to the passenger seat. However, when defendant saw all the blood, he began to "freak out bad." Serio told him to keep his mouth shut or he would kill defendant and his girlfriend, even if he had to order the hit from jail. Serio stated that he drove the body to the Bristol Renaissance Faire, where he rammed the gate and smashed the car's front. Serio saw that Neubauer was still alive, so he shot him in the head three or four more times. Serio stated that he hid the gun under the hood of his own vehicle. When the police stopped him, the officer did not find the gun. Serio stated that he then dropped defendant off at a motel, reminded defendant again that he would kill him and his girlfriend, and then disposed of the gun in an ice fishing hole. Serio stated that he and Schubat kept in constant contact after the murder. Schubat kept him informed of where the police investigation was headed. Serio stated that he "messed up by telling Amanda Barbaro I had killed Neubauer." Serio stated that he became "suspicious" of Barbaro when the police released her right after they had arrested her. Serio told McIntosh that he killed Neubauer and asked for her van and cell phone because he planned to flee. Serio provided defendant's attorneys with a typewritten affidavit executed on August 24, 2015. This affidavit was substantially the same as his handwritten affidavit. Serio stated in both affidavits that he was confessing because he was thinking about defendant "spending his life in prison for something I did."

¶ 63    Defendant argues that the Serio affidavit, along with McIntosh's and Patterson's affidavits, sets forth a colorable claim of actual innocence. Before commencing a successive postconviction proceeding, the petitioner must obtain leave of court. *Robinson*, 2020 IL

123849, ¶ 43. A request for leave to file a successive postconviction petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition does not set forth a colorable claim of actual innocence. *Robinson*, 2020 IL 123849, ¶ 44. Leave to file a successive petition should be granted where the supporting documentation raises the "probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 44. In determining the sufficiency of the successive petition, all well-pleaded allegations are taken as true, and the supporting affidavits, unless positively rebutted by the trial record, are also taken as true. *Robinson*, 2020 IL 123849, ¶ 45. In making this determination, the court does not make factual and credibility findings. *Robinson*, 2020 IL 123849, ¶ 45. If the court grants the petitioner leave to file a successive petition, the petition advances to the second stage, where the petitioner must make a substantial showing of actual innocence to proceed to an evidentiary hearing. *Robinson*, 2020 IL 123849, ¶ 43. To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such a conclusive nature that it would probably change the result on retrial. *Robinson*, 2020 IL 123849, ¶ 47. At the leave-to-file stage of the proceedings, the defendant is not required to conclusively prove his case. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 76. Rather, leave should be denied only where it is clear that the defendant cannot set forth a "colorable" claim of innocence. *Warren*, 2016 IL App (1st) 090884-C, ¶ 76.

¶ 64    In its memorandum denying defendant leave to file the second successive petition, the court analyzed McIntosh's and Patterson's affidavits. The court found that McIntosh's evidence was not newly discovered, because defendant knew about her proposed testimony before trial and had a hearing on its admissibility.

¶ 65    Concerning Patterson, the court found that her evidence—that Serio offered to "take care of" her abusive boyfriend and "make him go away" around the time of Neubauer's murder—was newly discovered. However, the court found that this evidence was not material, was cumulative, and was not of such conclusive character that it would probably change the result on retrial. First, the court found that the evidence was not material, because it tended to support Serio's conviction but not exonerate defendant. Second, the court found that Patterson's testimony was cumulative of trial evidence showing that Serio's motive for killing Neubauer was Neubauer's abusive treatment of Schubat. Finally, the court found that Patterson's testimony likely would not change the result on retrial, because it did not contradict the evidence at trial showing that Serio and defendant discussed killing Neubauer in the weeks leading up to the murder.

¶ 66    Regarding the Serio affidavit, the court found that Serio's allegations conflicted with "much" of the evidence at defendant's trial. The court stated that "witnesses" testified that defendant participated in the shooting and murder. The court also found that Schubat's testimony was similar to the April 4, 2002, confession that Serio gave to Jonites. Thus, the court concluded, Serio's allegations not only were contrary to Schubat's trial testimony, but they were contrary to his own confession to the police. Consequently, the court found that defendant failed "to carry his burden to make a substantial showing of a claim of actual innocence."

¶ 67    Defendant argues that the court applied the wrong legal standards in analyzing his supporting documentation and misstated the trial evidence. The State offers no argument to the

contrary. The court found that Patterson's testimony would be cumulative of trial testimony that Serio "desired to kill Neubauer for his treatment and abuse of [Schubat]." Yet, defendant's jury did not hear any evidence that Serio's motive was Neubauer's abusive treatment of Schubat. Schubat testified that Serio's motive was his lust for her. At trial, far from telling the jury about Neubauer's abusive behavior and his failure to pay child support, Schubat portrayed Neubauer as a doting father and wonderful romantic partner. The court's reasoning that "witnesses" testified at trial that defendant participated in the murder is also erroneous. The only witness who testified to defendant's participation was Schubat. Similarly, the court's recollection that Serio's confession to Jonites was introduced into evidence at defendant's trial was faulty.

¶ 68    As to the Serio affidavit, the court found that it was positively rebutted by the record because it conflicted with the trial evidence. Our supreme court in *Robinson* rejected this approach. The "conflicting evidence" standard "is not the proper inquiry at the leave-to-file stage of successive postconviction proceedings." *Robinson*, 2020 IL 123849, ¶ 57. The *Robinson* court noted that, "[i]f the new evidence of innocence does not contradict the evidence of petitioner's guilt at trial, the filing of the successive petition would be pointless, and the purpose of the Act would be rendered meaningless, which is a result that must be studiously avoided." *Robinson*, 2020 IL 123849, ¶ 57.

¶ 69    Lastly, although not required at the leave-to-file stage, the trial court found that defendant failed to make a "substantial showing" of a claim of actual innocence. A defendant must make a "substantial showing" only at the second stage to advance his claim to an evidentiary hearing. *Robinson*, 2020 IL 123849, ¶ 43. Because the court denied leave to file the second successive petition based on erroneous evidence and legal standards, defendant suggests that we reverse and remand for second-stage proceedings without considering the merits of his claims. We are not required to reverse and remand on this particular basis, as our review is *de novo* (*People v. Maclin*, 2021 IL App (1st) 172254, ¶ 13), which means that we perform the same analysis that the trial judge would perform using the proper standards. See *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151 (under *de novo* review, the reviewing court performs the same analysis that the trial judge would perform). Further, because our review is limited to the sufficiency of the allegations in a postconviction petition, "there is little justification for affording deference to the circuit court's decision." *Robinson*, 2020 IL 123849, ¶ 39.

¶ 70    Defendant argues that the McIntosh, Patterson, and Serio affidavits, taken together, establish a colorable claim of actual innocence, but, he maintains, he should be granted leave to file his second successive petition if even one of those affidavits is deemed sufficient. Courts have not prescribed a quantum of evidence necessary, except that the petition and supporting documentation must set forth a "colorable" claim of actual innocence. *Warren*, 2016 IL App (1st) 090884-C, ¶ 76. Accordingly, we will evaluate the affidavits individually rather than collectively.

¶ 71    Newly discovered evidence is evidence that was discovered after trial, which the defendant could not have discovered earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is material if it is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Evidence is noncumulative if it adds to the information that the fact-finder heard at trial. *Robinson*, 2020 IL 123849, ¶ 47. Finally, we deem evidence to be conclusive in character when, considered along with the trial evidence, it would probably lead to a different result. *Robinson*, 2020 IL 123849, ¶ 47. The most important element is the

- 12 -

conclusive character of the new evidence. *Robinson*, 2020 IL 123849, ¶ 47.

¶ 72                                                    a. *The McIntosh Affidavit*

¶ 73        Defendant asserts that McIntosh's evidence was newly discovered because it was not available to defendant at trial. Defendant argues that the reasons for its unavailability were threefold: (1) defendant's disclosure of McIntosh as a witness was untimely, (2) her testimony was deemed inadmissible because Serio would not testify to shooting Neubauer, and (3) McIntosh could not be compelled to testify because the court excluded her evidence. Defendant asserts that the untimeliness of his disclosure was due to the State failing to turn over the Marcy report. Further, defendant claims that the State knew about "Marcy" but disingenuously feigned surprise in moving to exclude McIntosh as a witness. Defendant argues that, with the Serio affidavit, McIntosh's testimony is now corroborated and would be admissible. Additionally, defendant argues that McIntosh's testimony is material and noncumulative, as it goes to the issue of defendant's innocence and corroborates the Serio affidavit. Defendant maintains that McIntosh's testimony would probably change the result of the trial because it demonstrates defendant's innocence and contradicts Schubat's testimony.

¶ 74        The State argues that (1) McIntosh's information is not new and (2) her evidence is barred by *res judicata* because on direct appeal we held that the court properly barred McIntosh's testimony. See *Ruhl*, 354 Ill. App. 3d 1171. Additionally, the State asserts that the court barred McIntosh's testimony primarily because defendant did not establish that McIntosh and Serio had a close acquaintance. The State lastly contends that McIntosh's testimony would probably not change the result on retrial because it would still be inadmissible under *Chambers*. *Chambers* established four factors to assist in determining the reliability of a hearsay statement that someone other than the defendant committed the crime: (1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred, (2) the statement is corroborated by other evidence, (3) the statement is self-incriminating and is against the declarant's interest, and (4) there was adequate opportunity to cross-examine the declarant. *People v. Thomas*, 171 Ill. 2d 207, 216 (1996). The *Chambers* factors are merely guidelines, and the presence of all four factors is not a condition for admissibility. *People v. Tenney*, 205 Ill. 2d 411, 435 (2002).

¶ 75        In ruling on the State's pretrial motion to bar McIntosh's testimony, the court found that McIntosh's evidence was uncorroborated. The court also found that Serio was not available for the State to cross-examine him, because he would not testify on defendant's behalf. Defendant argues that those impediments to admitting McIntosh's testimony have now been removed. Defendant maintains that McIntosh's evidence is corroborated by the Marcy report and that Serio has now come forward as a witness on defendant's behalf. Defendant relies on *People v. Ortiz*, 235 Ill. 2d 319 (2009), for the proposition that newly discovered evidence includes evidence that was unavailable at the first trial.

¶ 76        The State argues that defendant ignores that the trial court here also found, in ruling on the State's pretrial motion to bar McIntosh's testimony, that the relationship between Serio and McIntosh was not that of close acquaintances. The State notes that nothing related to that factor has changed since defendant's trial. However, given that the presence of all four *Chambers* factors is not required for determining admissibility (*Tenney*, 205 Ill. 2d at 435) and that Serio now is willing to testify that he shot Neubauer and say that defendant was an unwilling participant in the cover-up, we believe that McIntosh's testimony is newly discovered

evidence. The court in *Ortiz* held that a witness who had made himself unavailable before trial but then came forward 10 years later was newly discovered. *Ortiz*, 235 Ill. 2d at 334.

¶ 77 We also conclude that McIntosh's testimony is material and noncumulative. It bears on defendant's guilt or innocence, and there was no evidence at trial that Serio was the shooter. Thus, we must determine whether McIntosh's testimony is of such conclusive character that it would probably change the result on retrial. McIntosh's testimony is hearsay and subject to a reliability determination under the *Chambers* factors. However, *Robinson* instructs that, at the leave-to-file stage, we are not concerned with either the hearsay nature of the testimony or its admissibility. See *Robinson*, 2020 IL 123849, ¶¶ 77-81. We take the hearsay as true. See *Robinson*, 2020 IL 123849, ¶ 78. Considering McIntosh's testimony in that light, we conclude that it presents a colorable claim of actual innocence. McIntosh refutes Schubat's testimony that defendant shot Neubauer. (For an in-depth discussion of Schubat's testimony, see *infra* ¶¶ 92-94). No physical or forensic evidence linked defendant to the murder. In *People v. Henderson*, 2014 IL App (2d) 121219, ¶ 35, we held that an affidavit undermining the State's theory that the defendant was the shooter arguably could change the result upon retrial. Accordingly, we hold that the McIntosh affidavit sets forth a colorable claim of actual innocence.

¶ 78                                      b. *The Patterson Affidavit*

¶ 79 The court rejected Patterson's affidavit because it (1) supported Serio's guilt but did not tend to establish defendant's innocence and (2) was cumulative of testimony that the jury heard concerning Serio's desire to kill Neubauer due to his abusive treatment of Schubat. Defendant argues that Patterson's testimony contradicts the theory that defendant was the shooter. Defendant also argues that Patterson's testimony is not cumulative because the jury did not hear testimony about Neubauer's abusive behavior toward Schubat. We agree that Patterson's testimony is not cumulative.

¶ 80 The State concedes that Patterson's testimony is newly discovered evidence. However, the State argues that her testimony is not material, as Serio's offer to "take care of" Patterson's boyfriend does not exclude Serio having defendant shoot him. With respect to Patterson's statement that Schubat complained that Neubauer refused to pay child support, the State argues that it merely contradicts witnesses who testified to Schubat's and Neubauer's excellent relationship during the period leading up to the murder. However, the "conflicting evidence" standard "is not the proper inquiry at the leave-to-file stage of successive postconviction proceedings." *Robinson*, 2020 IL 123849, ¶ 57.

¶ 81 For purposes of a successive postconviction petition, newly discovered evidence is material if it is relevant and probative of the defendant's innocence. *Robinson*, 2020 IL 123849, ¶ 47. Defendant maintains that Patterson's testimony shores up Serio's motive for killing Neubauer. However, strengthening Serio's motive does not prove that he pulled the trigger. Serio offered to "take care of" Patterson's boyfriend and "make him go away." Serio did not say that he would personally do that. Consequently, we agree with the State that Patterson's testimony regarding Serio's offer to kill her boyfriend is not material.

¶ 82 Defendant posits that Patterson rebuts Schubat's testimony that Neubauer always paid child support. Defendant maintains that, under *Robinson*, new evidence that conflicts with the trial evidence meets the conclusive-character test. That is not what *Robinson* held. The court in *Robinson* simply rejected the notion that a court can deny leave to file a successive petition

- 14 -

just because the new evidence conflicts with the trial evidence. *Robinson*, 2020 IL 123849, ¶ 57. Accordingly, we determine that Patterson's testimony is not of such conclusive character that it would probably change the result on retrial.

¶ 83                                    c. *The Serio Affidavit*

¶ 84     Twelve years after Neubauer's murder, Serio executed an affidavit in which he claimed that he personally shot Neubauer and coerced defendant into helping him dispose of the body. We view the facts in the affidavit as true. Evidence that someone other than the defendant killed the victim and that the defendant was not present at the scene is material. *People v. Adams*, 2013 IL App (1st) 111081, ¶ 35. Here, the State does not challenge the materiality of the Serio affidavit or its noncumulative nature. The State argues that the Serio affidavit is not newly discovered evidence and that it is not of such conclusive character that it would probably change the result on retrial.

¶ 85                *i. Whether the Serio Affidavit Is Newly Discovered Evidence*

¶ 86     Generally, a codefendant's affidavit will be considered newly discovered evidence where the codefendant was not available to testify at the defendant's trial because to do so would have forced the codefendant to waive his privilege against self-incrimination. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984). The State acknowledges that such was the situation here. Serio was not tried until after defendant's trial concluded. The court even made a finding, in ruling on the State's motion to bar McIntosh as a witness, that Serio would exercise his right against self-incrimination.

¶ 87     Rather, the State argues that, after Serio was convicted and sentenced, defendant was not diligent in procuring exculpatory evidence. New evidence means evidence discovered after trial that could not have been discovered earlier through the exercise of due diligence. *People v. Coleman*, 2013 IL 113307, ¶ 96. The State notes that the Serio affidavit lacks a statement that Serio would not have admitted sooner that he was the shooter.

¶ 88     The State cites no authority for its position that a defendant must try to procure an exculpatory affidavit from a codefendant as soon as the codefendant has been tried, convicted, and sentenced. A codefendant's avenues for legal redress do not end with sentencing. He or she has the right to pursue a direct appeal and numerous collateral proceedings during which he or she may not wish to admit guilt. Defendant aptly relies on *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 17, where the defendant presented an exculpatory affidavit from a codefendant in support of his actual-innocence claim 14 years after the murder took place. The court noted that the affiant "did not specifically state why [the] defendant could not have obtained his testimony sooner, nor did [the] defendant allege what efforts he had taken to obtain this new account previously." *Simms*, 2021 IL App (1st) 161067-B, ¶ 23. Despite the long passage of time, the court held that the codefendant-affiant had a right against self-incrimination, which "[n]o amount of diligence" could have forced him to violate unless he chose to do so. (Internal quotation marks omitted.) *Simms*, 2021 IL App (1st) 161067-B, ¶ 23. Accordingly, we reject the State's argument that defendant failed to exercise due diligence. As the State concedes that Serio's new evidence is material and noncumulative, we examine whether it meets the conclusive-character test.

¶ 89             ii. *Whether the Serio Affidavit Satisfies the Conclusive-Character Test*

¶ 90       The conclusive-character test does not require total vindication or exoneration. *Robinson*, 2020 IL 123849, ¶ 55. Rather, it requires that the new evidence (1) significantly advance the defendant's actual-innocence claim and (2) place the trial evidence in a different light that undermines the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶¶ 55-56. "In assessing whether a [defendant] has satisfied the *low threshold* applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on retrial." (Emphasis added.) *Robinson*, 2020 IL 123849, ¶ 60. For new evidence to be "positively rebutted," it must be clear from the trial record that "no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. The inquiry at the leave-to-file stage of successive postconviction proceedings does not focus on whether the new evidence is inconsistent with the trial evidence. *Robinson*, 2020 IL 123849, ¶ 60. Rather, the focus is on whether the record affirmatively demonstrates that the trier of fact could never accept the veracity of the petition and supporting documents. *Robinson*, 2020 IL 123849, ¶ 60.

¶ 91       Looking at the trial evidence, we see that no physical or forensic evidence tied defendant to the murder. Nor did defendant make any confessions or admissions. The only witness who put defendant at the murder scene was Schubat. Schubat was also the only witness who placed defendant with Serio in Whiplash's kitchen a week before the murder, when she said that they joked about killing Neubauer. The other trial evidence showed that defendant was often in Serio's company, he ran Serio's errands, he mutely accompanied Serio when Serio obtained ammunition and attempted to buy a gun, and he was with Serio early on the morning that Neubauer's body was found. However, the murder gun was never found, and there was no evidence that the ammunition that Koets purchased was used to kill Neubauer. There was also no evidence, other than Schubat's testimony, that defendant knew of Serio's desire to kill Neubauer.

¶ 92       Schubat is the mainspring of the State's case against defendant. Without Schubat's testimony, the other evidence against defendant is not incriminating. At trial, Schubat changed her crucial testimony about when and where she saw the gun on the night of the murder.

¶ 93       On direct examination, Schubat testified that she first saw a gun in a drawer behind the bar a week before the murder. She testified that, on the night of January 5, defendant and Serio went into the kitchen behind the bar to talk. She assumed that defendant left by the back door because Serio came out of the kitchen alone. Then, when she went to the drawer for aspirin, the gun was gone, the inference being that defendant took it. Schubat testified that, after she heard the gunshot, defendant reentered the bar and placed the gun that she had seen in the drawer a week earlier onto the bar, the inference being that defendant shot Neubauer with that gun. So, according to Schubat, defendant left the bar, she looked in the drawer and discovered that the gun was missing, she heard the gunshot, and defendant was in possession of the gun when he reentered the bar.

¶ 94       However, on cross-examination, Schubat testified that, when she went into the drawer behind the bar to get aspirin, the gun was there, wrapped in a blue towel. According to Schubat, she did not see defendant near that drawer. She also did not see him remove the gun. *If the gun was in the drawer after defendant left the bar, he could not have used it to shoot Neubauer.* On cross-examination, Schubat testified that she did not see defendant place the gun on the bar

after the shooting. She testified that she was not paying attention to how the gun got onto the bar. She testified: "I looked up, and it was there."

¶ 95　　Next, we look at the Serio affidavit. Serio averred in pertinent part: "I personally shot and killed [Neubauer] ***. [Defendant] had no knowledge that I had planned to shoot Neubauer nor had we ever discussed Neubauer." According to the affidavit: "I told [defendant] to come to Whiplash to help me take the 'drunk person' home. It was only upon helping me move the 'drunk person' that [defendant] saw that the person was shot. I threatened to kill [defendant] and his girlfriend unless [defendant] helped me move and dump Neubauer's body." Serio further averred that he and Schubat discussed that "if something should go wrong we would say [defendant] shot Neubauer while we were inside the bar." Serio's affidavit certainly places the trial evidence in a different light.

¶ 96　　In accordance with *Robinson*, we first determine whether Serio's statements are positively rebutted by the record, keeping in mind that "positively rebutted" means that "no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Robinson*, 2020 IL 123849, ¶ 60. We determine that Serio's new evidence is not positively rebutted by the record. There is no physical evidence, such as defendant's fingerprints or DNA on a murder weapon or at the Wisconsin scene, that incontestably proves his guilt.

¶ 97　　Our second inquiry is whether Serio's new evidence is of such conclusive character that it would probably lead to a different result on retrial. Under the *Robinson* standard's low threshold, we consider whether the affidavit "raise[s] the probability that it is more likely than not that no reasonable juror would have convicted [defendant]." *Robinson*, 2020 IL 123849, ¶ 61. Thus, we consider Serio's new evidence in light of the trial evidence, not in light of evidence that we speculate may be introduced at a retrial, as the State argues. See *Coleman*, 2013 IL 113307, ¶ 97 (the court predicts what another jury would likely do, considering all the evidence, both new and *old*, together).

¶ 98　　Serio's affidavit now exonerates defendant as the shooter. The only contrary evidence is Schubat's uncorroborated and self-impeached testimony. Thus, we reject the State's argument that the trial evidence "overwhelmingly" implicated defendant as the person who murdered Neubauer. The State argues that Serio is defendant's "very good friend" who is now "magnanimously" taking sole responsibility for the murder. The State also maintains that the Serio affidavit contradicts Serio's own confession. However, those arguments go to Serio's credibility. The State also makes a lengthy and emotional plea in favor of Schubat's credibility. These arguments are not well taken, as we do not indulge in credibility determinations at the leave-to-file stage. *Warren*, 2016 IL App (1st) 090884-C, ¶ 77.

¶ 99　　Finally, the State relies on *People v. Fenton*, 2021 IL App (1st) 171483-U. *Fenton* is distinguishable. In *Fenton*, the appellate court considered the defendant's actual-innocence claim under *Robinson*'s conclusive-character standard. *Fenton*, 2021 IL App (1st) 171483-U, ¶ 43. In *Fenton*, Donnie Moore filed an affidavit recanting his trial identification of the defendant as the shooter during a melee that resulted in the victim's death. *Fenton*, 2021 IL App (1st) 171483-U, ¶ 31. Moore's affidavit also gave the defendant an alibi. *Fenton*, 2021 IL App (1st) 171483-U, ¶ 31. The court held that Moore's testimony was newly discovered, material, and noncumulative but that it was not of such conclusive character that it would probably change the result on retrial. *Fenton*, 2021 IL App (1st) 171483-U, ¶¶ 43-45. The court noted that three other eyewitnesses had identified the defendant at trial as the shooter. *Fenton*,

2021 IL App (1st) 171483-U, ¶ 44. In its analysis, the court also noted *Robinson*'s rejection of the conflicting-evidence standard, but then used it anyway in concluding that Moore's recantation testimony was contradicted by his own grand jury and trial testimony. *Fenton*, 2021 IL App (1st) 171483-U, ¶¶ 43-44. Here, in contrast to *Fenton*, Schubat was the only uncorroborated eyewitness, and she retracted her testimony on direct examination placing the gun in defendant's possession when Neubauer was shot. Accordingly, taking Serio's new testimony as true without making any credibility assessments, we conclude that the Serio affidavit raises the probability that it is more likely than not that no reasonable juror would have convicted defendant.

¶ 100                                        C. Defendant's *Brady* Claim

¶ 101    Defendant contends that the State's admitted failure to disclose the Marcy report in discovery was a *Brady* violation requiring a new trial. The court denied this claim because it found that the Marcy report was not material either to guilt or punishment. The court found that defendant had the information contained in the Marcy report prior to trial. The court also erroneously stated that McIntosh testified at defendant's trial. (McIntosh testified at the hearing on the State's motion *in limine* to bar her testimony.) The court concluded that, prior to defendant's trial, it had correctly found McIntosh's testimony to be inadmissible under *Chambers* because she was not a close acquaintance of Serio's.

¶ 102    In *Brady*, the Supreme Court of the United States held that the prosecution violates a defendant's constitutional due process right when it fails to disclose evidence favorable to the accused that is material to guilt or punishment. *Brady*, 373 U.S. at 87. This rule applies to evidence that is known to police investigators but not the prosecution. *People v. Beaman*, 229 Ill. 2d 56, 73 (2008). Here, the Marcy report contained information that Serio confided his involvement in Neubauer's murder to "Marcy." Within limitations, a defendant may attempt to prove that someone else committed the crime with which he or she is charged. *People v. Simmons*, 372 Ill. App. 3d 735, 749 (2007). Thus, the Marcy report is favorable to defendant. The issue is its materiality.

¶ 103    Section 122-1(f) of the Act provides that a defendant may file only one postconviction petition without leave of court. 725 ILCS 5/122-1(f) (West 2018). Leave of court may be granted only if the defendant demonstrates cause for his or her failure to bring the claim in the initial postconviction proceeding and prejudice results from that failure. 725 ILCS 5/122-1(f) (West 2018). "Cause" means any objective factor, external to the defense, that impeded the defendant's ability to raise a specific claim in the initial postconviction proceeding. *Pitsonbarger*, 205 Ill. 2d at 462. "Prejudice" occurs when an error so infected a proceeding that the resulting conviction or sentence violates due process. *Pitsonbarger*, 205 Ill. 2d at 464. Both "cause" and "prejudice" must be established for the defendant to prevail. *Pitsonbarger*, 205 Ill. 2d at 464. Leave to file a successive petition should be denied where it is clear, from a review of the petition and its supporting documentation, that the defendant's claim fails as a matter of law or where the successive petition with its supporting documentation is insufficient to justify second-stage proceedings. *People v. Bailey*, 2017 IL 121450, ¶ 21.

¶ 104    Here, defendant argues that cause is met because the State concedes its failure to disclose the Marcy report. Defendant argues that prejudice exists because, had the State disclosed the Marcy report, he would have known months sooner that both McIntosh and her fiancé Jim "would have testified that Serio admitted to being the sole shooter." Defendant posits that

- 18 -

timely disclosure of the Marcy report would have changed the result of the hearing on the State's motion to bar McIntosh. First, defendant argues, the Marcy report corroborates McIntosh's testimony, allowing him to rebut the State's motion to bar, and second, the report identifies a second witness, Jim, who would have testified to Serio's confession.

¶ 105 The State asserts that the prosecution's failure to tender the Marcy report to the defense was not a *Brady* violation where (1) the report contained no information that was not known to defendant and (2) both McIntosh's and Jim's testimony were inadmissible hearsay.

¶ 106 Even assuming, which we do not decide, that defendant has demonstrated cause, he cannot demonstrate prejudice. Although the Marcy report might have corroborated, at least in part, McIntosh's testimony, Serio would still have been unavailable for cross-examination. Also, defendant ignores that McIntosh's testimony was barred at trial, in part, because the court found that she was not a close acquaintance of Serio's. The Marcy report says nothing about that relationship, and McIntosh confirmed in her testimony that she and Serio had a working relationship but not one in which Serio would entrust confidences to her. Consequently, we determine that the Marcy report would not have changed the hearing outcome on the State's motion to bar McIntosh's testimony. Accordingly, we hold that the court properly denied defendant's *Brady* claim.

¶ 107 D. Whether the Trial Judge Should Be
Removed for Cause Upon Remand

¶ 108 Lastly, defendant contends that the trial judge should be removed for cause upon remand. Defendant notes that, to prevail on a motion for substitution of judge for cause, a defendant must show "actual prejudice, animosity, ill will or distrust directed toward the defendant." (Internal quotation marks omitted.) *People v. Blanck*, 263 Ill. App. 3d 224, 232 (1994). Defendant also relies on *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 74, where the court held that, to have a matter remanded to a different judge, the defendant must demonstrate that the judge displayed "hostility, animosity, distrust, ill will, prejudice, predilections, or arbitrariness." The court in *Wilson* also admonished that "[t]he determination that a judge is disqualified due to prejudice is not to be made lightly" because it "reflects unfavorably upon the judge and tends to disrupt the judicial system." *Wilson*, 2019 IL App (1st) 181486, ¶ 75.

¶ 109 Here, defendant argues that the judge meets the above criteria where he delayed ruling on defendant's motion for leave to file the second successive postconviction petition for nine months, used the wrong legal standards in the eventual ruling, misstated evidence, and conflated defendant's trial with Serio's. In essence, defendant asserts that the judge was inattentive. Even if that were true, we do not equate mistaken analyses with deliberate ill will.

¶ 110 With respect to the delay, we note that defendant's second successive postconviction petition with supporting documentation is 389 pages. Had the judge not taken his time, defendant might complain that he ruled hastily. Defendant also asserts that the judge was biased by his belief in defendant's guilt, but he cites nothing from the record to support this allegation. Defendant fails to demonstrate that the judge displayed any ill-temperedness or made any untoward comments concerning his guilt. In sum, defendant concludes only that "the trial court erred when it wrongly denied [defendant's] motion [for leave to file a second successive postconviction petition]." That a judge has ruled against a defendant in a prior case is not sufficient grounds to disqualify that judge from hearing subsequent cases involving the same defendant. *People v. Taylor*, 101 Ill. 2d 508, 518 (1984). Accordingly, we deny

defendant's motion for substitution of judge upon remand.

¶ 111                          III. CONCLUSION
¶ 112      Because we determine that the Serio and McIntosh affidavits set forth a colorable claim of actual innocence at the leave-to-file stage, we reverse the judgment of the circuit court of Lake County, and the cause is remanded for second-stage postconviction proceedings.

¶ 113      Reversed and remanded.